LOUISA J. DENNIS *vs.* ELIAS M. DENNIS.

Second Judicial District, Norwich, May Term, 1896. ANDREWS, C. J., TORRANCE, FENN, BALDWIN AND HAMERSLEY, JS.

Upon the wife's application for a divorce on the ground of habitual intemperance, the Superior Court found that about once in three weeks for a period of two years the defendant became intoxicated during the evening to such an extent that he did not go as usual the next morning to his business as a clerk; but it did not appear that this occasioned any trouble between the defendant and his employer, nor that it had been so gross or so long continued as to have produced want or suffering in the family. *Held* that the question was so largely one of fact for the

determination of the trial court, that its refusal to grant a divorce upon this ground could not ordinarily be held to be erroneous as matter of law.

A divorce sought by the wife upon the ground of her husband's adultery, will be refused, where the act of adultery relied upon was brought about by the connivance of the wife.

Although the wife did not specifically direct, or have actual, personal knowledge of, the plans adopted and executed by her general agents in her behalf, to entrap her husband into an act of adultery with a lewd woman employed by them for that purpose, a finding that the act of adultery proved was brought about by the connivance and procurement of the wife acting through her attorneys or agents, is not as a matter of law erroneous.

All courts possessing divorce jurisdiction are vested with a legal discretion, in order that all attempts to use the forms of the law of divorce for immoral, vindictive, or fraudulent purposes, may be discovered and · defeated.

[Argued May 27th—decided June 25th, 1896.]

SUIT for divorce, brought to the Superior Court in New London County and tried to the court, *Prentice, J.;* facts found and judgment rendered for the defendant, and appeal by the plaintiff for alleged errors in the rulings of the court. *No error.*

This was a complaint brought to the Superior Court in New London county, alleging that the parties were married in 1890, and had always since their marriage lived in the city of New London; that the defendant had for more than two years been habitually intemperate, and that he had committed adultery; and claiming a divorce. The answer denied the matters contained in the complaint, and charged that the acts on which the offense of adultery was based, were committed through the procurement and with the connivance of the plaintiff, her agents and attorneys. The court found these issues for the defendant, denied her prayer, and dismissed the complaint. The plaintiff appealed.

The court made a finding of facts as follows: "1. The plaintiff and defendant intermarried February 4th, 1890, and have one child, the issue of such marriage, a boy, four years of age. 2. The plaintiff and defendant were married at Norwich, and since their marriage have lived in New London. 3. For a period of two years prior to the date of

the complaint, the defendant was accustomed to use intoxicating liquors more or less. About once in three weeks he became intoxicated, during the evening, to such an extent that the next morning he did not go as usual to his work at the store where he was employed as a clerk. 4. May 18th, 1895, the defendant was caught in a compromising situation with a woman unknown. There was no direct evidence offered of any overt act of adultery; the circumstances however, were such as to justify the inference that the defendant was then guilty of adultery, and I so find. 5. This woman was one employed by the plaintiff's agents to lure the defendant to the commission of adultery, and to the commission of the particular act of adultery above specified, for the purpose of thereby obtaining evidence upon which a divorce could be secured. The circumstances attending the employment and conduct of this woman were the following: 6. In April, 1895, the plaintiff being desirous of obtaining a divorce from her husband, went to Boston and there consulted a lawyer, to whom she was recommended by a friend. This lawyer advised her to employ detectives upon her husband for the purpose of obtaining evidence upon which the desired divorce might be secured. She consented, retained him to represent her interests, and left the whole matter, including the procurement of the necessary evidence, in his hands, with full authority to act at his discretion and in such manner as he thought best in the procurement of such evidence, and in the employment and use of detectives therefor as might be necessary. Pursuant to this arrangement and authority, and for the purposes aforesaid, male detectives were employed by said attorney on behalf of the plaintiff. These came to New London from Boston, and for a period of two or three weeks shadowed the defendant. At the end of this time the woman above referred to was in like manner employed to act in concert with the other detectives, and by her wiles to entice the defendant into an act of adultery, or into a compromising situation from which the inference of adultery would be drawn, so arranged that his discovery by her associates might be made. 8. She came

to New London and began to ply her arts upon the defendant. In the course of a week or ten days she succeeded in making an assignation with the defendant at a house in the city for the following evening, that of May 18th, 1895. Her associates having been duly apprised, arrangements were made for the discovery, which was made as planned, by the sudden appearance to the defendant in his compromising position at said assignation of two of the detectives, accompanied by the plaintiff, who had come to the scene for the purpose. 9. No evidence of any other act of adultery on the part of the defendant was offered. 10. The plaintiff did not give to her said attorney, or to any of the detectives employed by him, any distinct or specific authority or direction, as distinguished from the general authority hereinbefore set out, to employ said woman for the purposes for which she was employed, or to employ any woman for such purpose, and the plaintiff had no actual personal knowledge that the woman found with her husband was one employed by her agents in the manner in which, or for the purposes for which, she was employed. 11. I find upon the foregoing facts that the defendant was not, during the two years prior to the date of the complaint, habitually intemperate; and that the act of adultery established by the evidence was one brought about by the connivance and procurement of the plaintiff, acting through her attorneys or agents. By reason of said facts and finding, and in the exercise of the discretion vested in the court in said matter, the plaintiff's complaint was dismissed. 12. Upon the trial the plaintiff claimed that upon the facts the defendant was guilty of habitual intemperance within the meaning of § 2802 of the General Statutes; and that the fact of adultery being found, the plaintiff was entitled to a divorce, since the evidence did not establish connivance on the part of the plaintiff within the meaning of the law, and the facts proven were not such as to constitute a bar to her complaint. The plaintiff claimed that although there was collusion between the detectives and the woman, yet as the plaintiff had no knowledge of it she was not affected by it, and not thereby barred from obtaining a divorce."

The errors urged in this court are : 1. That the trial court erred in deciding upon the facts found that the defendant was not habitually intemperate. 2. That the court erred in ruling that the facts found constituted in law connivance on the part of the plaintiff, and that she was barred thereby from obtaining a divorce for the adultery of the defendant. 3. That the court erred in ruling that upon the facts found the court could, as an act of discretion, refuse to grant the plaintiff a divorce for the defendant's said adultery.

*Donald G. Perkins* and *William Belcher*, for the appellant (plaintiff).

The facts found constituted habitual intemperance within the meaning of the statute. Stand. Dic. "Habitual"; *Com.* v. *Whitney*, 5 Gray, 86; *Com.* v. *McNamee*, 112 Mass. 285; 5 Amer. & Eng. Ency. of Law, 807. The fact that the defendant attended his business quite regularly, and was drunk usually out of business hours, does not prevent it from being habitual intemperance. *Richard* v. *Richard*, 19 Ill. App. 435. What constitutes habitual intemperance is a question of law. 1 Bish. Mar. and Div. § 813; *Mayhew* v. *Mayhew*, 61 Conn. 234. The court having found the defendant guilty of adultery, the plaintiff was thereupon entitled to a divorce as matter of right; the court had no discretion in the matter. The remedy is statutory and the action in its nature civil, and the courts proceed to grant the remedy in accordance with the fixed and established principles of law applicable to it. *Delliber* v. *Delliber*, 9 Conn. 233; *Shaw* v. *Shaw*, 17 id. 193; *Lyons* v. *Lyons*, 21 id. 194; *Steele* v. *Steele*, 35 id. 54. This court has, in numerous cases, reviewed the action of the Superior Court in granting or refusing a divorce, as in *Mayhew* v. *Mayhew*, 61 Conn. 234, where the cause was intolerable cruelty, which it could not do, if it was a matter in the discretion of the Superior Court. The connivance, relied upon by the defendant as a bar, is a question of fact; and the essential element therein is not found by the trial court. The finding is simply that the plaintiff authorized her attorney to employ detectives to watch the defendant,

Dennis *v.* Dennis.

and by watching him to obtain evidence. The court has not found that the attorney employed the woman, or knew that she was employed; and even though it may be claimed that the authority to him to act in his discretion, was broad enough to authorize him to employ a woman for that purpose, still the fact must be found that he did employ the woman or authorize it, otherwise there is a break in the line of authority from the plaintiff. *Quinebaug Bank* v. *Brewster*, 30 Conn. 564; 2 Bish. Mar. and Div. §§ 6, 7, 9; *Wilson* v. *Wilson*, 154 Mass. 195; *Robbins* v. *Robbins*, 140 id. 531.

*Augustus Brandegee*, with whom was *George C. Morgan*, for the appellee (defendant).

Habitual intemperance is a "condition" founded upon facts, evidenced solely by testimony, and in each individual case to be determined by the trial court upon the evidence before it. In this case the court finds "that the defendant was not during two years prior to the date of the complaint, habitually intemperate." In the case of *Frumpy* v. *Frumpy*, 43 Conn. 273, this court refused to review a decision of the trial judge upon this precise question. The connivance of the plaintiff's attorney was a bar to her obtaining a divorce, procured by means of such connivance. But there is a higher ground than the rule of agency or the law of connivance. It is contrary to public policy that a divorce should be granted in this State upon the testimony of sneaks and panders, for a marital offense brought about by their own criminal conduct, and while acting as agents and attorneys of the petitioner. In this State a divorce is not a matter of right but of grace. It cannot be had by the procurement or consent of the parties; it is only granted upon such terms, by such courts, and upon such considerations, as the State sees fit. The guarded language of our statute was intended to reserve to the court a "sound discretion" to withhold a divorce, even in a case proved, where public policy is opposed to its being granted. This view of the law is ably discussed in the case of *Dutcher* v. *Dutcher*, 39 Wis. 651, in construing a similar statute. See also *Morrison* v. *Morrison* 130 Mass. 310; *Sparhawk* v. *Spar-*

Dennis *v.* Dennis.

*hawk*, 120 id. 392; *Hunt* v. *Hunt*, 72 N. Y. 228. It is a familiar principle of law that the exercise of such discretion, unless plainly and palpably abused, will not be reviewed by this court. *Chapman* v. *Loomis*, 36 Conn. 460.

ANDREWS, C. J. Habitual intemperance as a cause for which a divorce might be granted, was first named in this State by a statute enacted in 1843, where it was coupled with intolerable cruelty. Precisely what constitutes habitual intemperance within the meaning of that statute, it is not easy to define. It may however be safely assumed that the purpose of the Act was not primarily to promote temperance or to reform the offender, but to preserve the peace, comfort, safety, happiness and prosperity, of the non-offending party, and of the family of which they are together the members and parents. In a note upon this statute left by the late CHIEF JUSTICE CHURCH, he said : " The habitual use of intoxicating liquor, though producing excitement, will not justify a divorce. The habit must be so gross as to produce suffering or want in the family to a degree which cannot be reasonably borne." We are not aware that any court in this State has attempted to define these words. The expression is one of those terms which, like the expression " intolerable cruelty," often arise in the law and which cannot well be defined in advance. They must be applied by the trier to cases as they arise, by inclusion or exclusion, and the existence of the condition in question decided as a matter of fact. The language of the statutes in other States, by which the use of spirituous liquors is made a cause for divorce, is so divergent as to afford but little aid in the construction of our own. In California it has been held that a fixed habit of drinking to excess, to such a degree as to disqualify a person from attending to his business during the principal portion of the time usually devoted to business, is such " habitual intemperance " as is made a ground of divorce. *Mahone* v. *Mahone*, 19 Cal. 626. " Habitual intemperance " is a condition ; and when any person gets into that condition he is said to be " habitually intemperate." These latter words are frequently used in

policies of insurance, and in various cases arising on such policies these words have been the subject of judicial discussion. In the case of the *N. W. Life Ins. Co.* v. *Muskegon Bank*, 122 U. S. 501–505, the Supreme Court of the United States, by JUSTICE MILLER, said : " The whole case turned, so far as the jury was concerned, upon the true definition of the words ' habitually intemperate.' . . . We do not know of any established legal definition of those words. As they relate to the customs and habits of men generally in regard to the use of intoxicating drinks, and as the observation and experience of one man on that subject is as good as another of equal capacity and opportunities, their true meaning and signification would seem to be a question addressed rather to the jury than to the court. While there may be on the one hand such a clear case of intemperate habits as to justify the court in saying that such and such facts constitute a condition of habitual intemperance, or on the other hand such an entire absence of any proof, beyond an occasional indulgence in the use of ardent spirits, as to warrant the opposite conclusion, yet the main field of inquiry, and the determination of the question within it, must be submitted to the jury, and the question on this submission must be decided by them." The case of *Insurance Co.* v. *Foley*, 105 U. S. 350, was on a policy of this kind. The court below had instructed the jury that if the habits of the insured " in the usual, ordinary, and every-day routine of his life were temperate," he was not intemperate within the meaning of the policy, although he had " had an attack of *delirium tremens* resulting from an exceptional indulgence ; " and this instruction was sustained.

The finding in this case shows that the defendant " about once in three weeks became intoxicated, during the evening, to such an extent that the next morning he did not go as usual to his work at the store where he was employed as a clerk," and had continued to do so for a period of two years. While this condition of the defendant very likely caused annoyance and vexation to the plaintiff, and possibly grief and humiliation, it does not appear to have occasioned any loss of position to the defendant or any trouble between him and his

employer, nor does it appear to have been so gross or so long continued as to have produced want or suffering in the family. We fail to see in this case that the Superior Court committed any error in law in this respect.

The trial court held that the act of adultery proved was one brought about by the connivance and procurement of the plaintiff, acting through her attorneys or agents. The appellant strenuously insists that this finding is not supported by the evidence. Connivance is the corrupt consenting of a married party to that conduct of the other of which afterwards complaint is made. It bars the right of divorce because no injury is received; for what a person has consented to, he cannot set up as an injury. Connivance is a thing of the intent resting in the mind. It is the consenting. But the connivance may be the passive permitting of the adultery or other misconduct, as well as the active procuring of its commission. If the mind consents, that is connivance. *Ross* v. *Ross*, L. R. 1 P. & D. 734 ; *Pierce* v. *Pierce*, 3 Pick. 299.

The connivance of the plaintiff is established as a fact upon evidence, to the admission of which no objection was made, and we suppose this to be a conclusion which this court cannot revise. The argument of the appellant is founded on that part of the finding which says that " the plaintiff did not give to her said attorney, or to any of the detectives employed by him, any direct or specific authority or direction, as distinguished from the general authority hereinbefore set out, to employ said woman for the purposes for which she was employed, or to employ any woman for such purpose, and the plaintiff had no actual personal knowledge that the woman found with her husband was one employed by her agents in the manner in which or for the purposes for which she was employed." The argument is that this finding is inconsistent with the conclusion to which the court came, because it shows, as she claims, that her mind never consented to the adultery of her husband. This argument cannot be maintained in view of the other facts of the case. Connivance can usually be proven only by proving facts from which, with their circumstances, it may be inferred. From

Dennis *v.* Dennis.

the finding before us it appears that the plaintiff had suspected her husband of infidelity, although she did not suspect any particular woman. She was desirous of obtaining a divorce. She consulted an attorney in Boston who advised her to employ detectives to watch her husband. She authorized that attorney to employ such detectives for that purpose as he saw fit, to procure such evidence as in his judgment was necessary, giving him full authority in the premises. Detectives were employed by him and sent from Boston to New London. Among other things done by this attorney and the detectives he hired, a lewd woman was employed to lure the defendant by her wiles into an act of adultery, or into a compromising situation from which the inference of adultery would be drawn, so arranged that his discovery would be made. This lewd woman came to New London, commenced her practices on the defendant, succeeded in attracting his attention and in drawing him into the precise sort of an act for which she was employed. During the progress of her efforts the plaintiff was informed by the detectives that her husband had been seen with a woman at night in the streets of the city, and on the night arranged for the discovery she went with the detectives to the room where the defendant and the lewd woman were together. There was sufficient to justify the Superior Court in finding that the plaintiff must have known that the movements of this lewd woman were in some way governed by the detectives who she knew had been employed by her attorney, and who gave her the information which they did by which she was enabled to confront her husband while in that woman's company. Soon thereafter the plaintiff caused her petition for a divorce to be brought, praying for a divorce based on the act she had so discovered. Her conduct then and ever since might well be deemed to cast a reflex light on her knowledge of the purposes for which the detectives were employed, and her consent to the artifices which they practiced. These are the facts and circumstances from which the trial court held that the plaintiff was barred of all right to have a divorce for the acts of adultery she had proved. In the light of the authorities we have cited we think the de-

cision of the court on this part of the case should not be disturbed. *Morrison* v. *Morrison*, 136 Mass. 310; *Myers* v. *Myers*, 41 Barb. 114; *Hedden* v. *Hedden*, 21 N. J. Eq. 61; *Austin* v. *Austin*, 10 Conn., 221; *Cairns* v. *Cairns*, 109 Mass. 408; *Masten* v. *Masten*, 15 N. H. 159; *Gower* v. *Gower*, L. R. 2 P. & D. 428. In this last case it was held that "if a person employed by a husband to watch his wife for the purpose of obtaining evidence of her adultery, brings about an act of adultery, the husband cannot obtain a decree of dissolution (of the marriage) on the ground of such adultery, although he may not have directed or authorized his agent to bring it about." The petitioner admitted that he had employed one Williams to watch the respondent and to obtain evidence of her adultery, but denied that he had ever instigated Williams to induce her to commit adultery, or sanctioned his taking any steps with that view. The evidence showed that the act of adultery on which the petitioner relied, had been brought about by the contrivance of Williams. In deciding the case The JUDGE ORDINARY said: "I think it quite possible that he (the petitioner) did not tell Williams to do what Williams appears to have done; but at the same time, he never warned him not to do what a man of his class and character would be likely to do. The very first thing which would occur to such a man, if evidence were not forthcoming, would be to make an occasion which should furnish that evidence. In that point of view the petitioner is responsible for the act of his agent. But I decide the case on the broader ground that the petitioner cannot obtain the benefit of redress in this court for an act of adultery brought about by his own agent." Other cases supporting the same doctrine are *Williamson* v. *Williamson*, L. R. 7 P. & D. 76; *Hawkins* v. *Hawkins*, L. R. 10 id. 177; *Heyes* v. *Heyes*, L. R. 13 id. 11.

The State makes itself a party to all marriages, in that it requires the marriage contract to be entered into before officers designated by itself, and with certain formalities which it has prescribed. The State does this not alone that children may be born and properly reared, but that the parties to

the marriage may themselves be the better citizens; it being in accordance with the experience of all mankind that human beings are happier and are better citizens and better disposed towards the State, when married and surrounded by the ties of a family and with children, than when they remain unmarried. The State desires good citizens. It regulates divorce procedure in its own interest. A divorce cannot be had except in that court which the State authorizes, and for those causes only, and with those formalities, which it has by statute prescribed. As the State favors marriages for the reasons stated, so the State does not favor divorces; and only permits a divorce to be granted when those conditions are found to exist, in respect to one or the other of the married parties, which seem to the legislature to make it probable that the interests of society will be better served and that parties will be happier, and so the better citizens, separate, than if compelled to remain together. The State allows divorces, not as a punishment to the offending party nor as a favor to the innocent party, but because the State believes its own prosperity will thereby be promoted. *Seeley's Appeal*, 56 Conn. 202, 206.

The forms of the law of divorce should never be allowed to minister to the caprices of fickle-minded persons, or to the revenges of the disappointed or vindictive; and least of all to the passions of the incontinent. Nor under any circumstances should they be used in fraud of the statute allowing divorces, nor of the court. To the end that any and all attempts to use the forms of the law of divorce for any of the purposes indicated, shall be discovered and defeated, all courts possessing divorce jurisdiction are vested with a discretion. A wise discretion should always be exercised in administering the law of divorce, lest its spirit be disobeyed by a too narrow adherence to its letter. " Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discovered, it is the duty of the court to follow it. Judicial power is never exer-

cised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the legislature; or, in other words, to the will of the law." CH. J. MARSHALL in *Osborn* v. *U. S. Bank*, 9 Wheaton, 738, 866.

There is no error.

In this opinion the other judges concurred.